UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHAWN BALDWIN | No. 17 CR 787<br><br>Judge John Robert Blakey |

**GOVERNMENT'S RESPONSE TO DEFENDANT'S
POST-TRIAL MOTIONS**

The UNITED STATES OF AMERICA respectfully submits the following response to defendant Shawn Baldwin's Motion for New Trial and/or Judgment of Acquittal.

**ARGUMENT**

**I.    LEGAL STANDARD**

    **A.    Rule 29**

A motion for judgment of acquittal challenges the sufficiency of the evidence to sustain a guilty verdict against a defendant. Fed. R. Crim. P. 29. The case law regarding motions made pursuant to Rule 29 is well settled. "In challenging the sufficiency of the evidence, [a defendant] bears a heavy, indeed, nearly insurmountable, burden." *United States v. Warren*, 593 F.3d 540, 546 (7th Cir. 2010); *see also United States v. Orlando*, 819 F.3d 1016, 1021 (7th Cir. 2016) ("defendant faces an uphill battle in challenging the sufficiency of the evidence."); *United States v. Miller*, 782 F.3d 793, 797 (7th Cir. 2015); *United States v. Jones*, 713 F.3d 336, 339-40 (7th Cir. 2013); *United States v. Berg*, 640 F.3d 239, 246 (7th Cir. 2011).

Under Rule 29, courts "do not reassess the weight of the evidence or second-guess the trier of fact's credibility determinations." *United States v. Arthur*, 582 F.3d 713, 717 (7th Cir. 2009); *see also United States v. Severson*, 569 F.3d 683, 688 (7th Cir. 2009). This strict standard recognizes that "[s]orting the facts and inferences is a task for the jury." *Warren*, 593 F.3d at 547.

The reviewing court will view the "evidence in the light most favorable to the prosecution," and the defendant "must convince" the court that, even in that light, "no rational trier of fact could have found him guilty beyond a reasonable doubt." *Warren*, 593 F.3d at 546 (quotation omitted); *see also United States v. Rahman*, 805 F.3d 822, 836 (7th Cir. 2015). In other words, a court will "set aside a jury's guilty verdict only if 'the record contains no evidence, regardless of how it is weighed,' from which a jury could have returned a conviction." *United States v. Presbitero*, 569 F.3d 691, 704 (7th Cir. 2009) (quotation omitted). The ample trial evidence, particularly when viewed in the light most favorable to the government, overwhelmingly proved defendant's guilt.

B.  **Rule 33**

Rule 33 provides that a court "may vacate any judgment and grant a new trial if the interest of justice so requires." Fed. R. Crim. P. 33(a). "A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly." *United States v. Santos*, 20 F.3d 280, 285 (7th Cir. 1994) (quotation omitted). Courts may grant a new trial if the jury's verdict is "so contrary to the weight of the evidence that a new trial is required in the interest of justice." *See United States v. Washington*, 184 F.3d 653, 657 (7th Cir. 1999). Put another way,

"[t]he court should grant a motion for a new trial only if the evidence preponderate[s] heavily against the verdict, such that it would be a miscarriage of justice to let the verdict stand." *United States v. Swan*, 486 F.3d 260, 266 (7th Cir. 2007) (alteration in original) (internal quotations omitted). Thus, it is well-settled that motions seeking new trials are disfavored and should be granted sparingly and in "only the most extreme cases." *United States v. Linwood*, 142 F.3d 418, 422 (7th Cir. 1998) (quotation omitted); *United States v. Gillaum*, 372 F.3d 848, 857-58 (7th Cir. 2004) (citation omitted) (courts should exercise "great caution" and be "wary of second guessing" the jury's verdict); *United States v. Morales*, 902 F.2d 604, 605 (7th Cir. 1990) ("A jury verdict in a criminal case is not to be overturned lightly, and therefore a Rule 33 motion is not to be granted lightly.").

As set forth below, defendant has failed to show that any trial error occurred, much less one that would have caused a prejudicial effect on the jury's verdict.

## II. The Court Properly Denied Defendant's Motion for a Mistrial in Connection with the Testimony of the FBI Summary Witness.

Defendant has renewed his motion for a mistrial—presumably under Rule 33—based on his claim that David Paniwozik, the FBI summary witness, testified in a way that misled the jury. Specifically, defendant argues that Mr. Paniwozik led the jury to believe that his summary charts included each and every account associated with the defendant, when in reality they did not. This Court denied the motion after determining that Mr. Paniwozik's testimony was not false—as conceded by defendant during the trial—and that the parties' testimony and stipulations made clear to the jury that there were other accounts associated with the defendant that Mr. Paniwozik

3

did not include in his summary charts, which meant his testimony was not misleading.

Mr. Paniwozik testified that Government Exhibit S-2.2 contained a list of more than 50 accounts that he reviewed as part of his analysis. He testified that "this is a listing of all of the accounts that were reviewed in part of my analysis." 2/16/19 Tr. 6. He explained that all but two of them were accounts for which Baldwin was a signatory, and that as to those additional two accounts Baldwin was "associated" with them. 2/16/10 Tr. 6-7. On the chart, those accounts were categorized as personal accounts, business accounts, or trading accounts. He said again that these were the universe of accounts he analyzed. 2/16/19 Tr. 11. At no time did he testify that he had included every possible Baldwin account in his analysis. Indeed, early in his testimony he described that his analysis focused on tracing the flow of money from the 15 investors/lenders into and out of the 50 accounts. 2/16/19 Tr. 12. When he subsequently testified about "all" the debit card purchases or debit card purchases from "all" accounts, he made clear that he was referring to the 52 accounts that he had analyzed, as opposed to just the personal accounts, business accounts, or trading accounts. *See, e.g.*, 2/16/19 Tr. 27 (referring to Government Exhibit S-4); *id.* at 35 (referring to Government Exhibit S-16); *id.* at 44, 47 (referring to Government Exhibit S-21). Moreover, it was clear from his summary charts that his reference to "all" accounts meant all accounts he had included in his summary: personal, business, and trading.

Not only was Mr. Paniwozik's summary testimony not misleading, the jury was made aware that Baldwin had other accounts that were not included in his summary analysis. Baldwin himself testified that he had other accounts that were not included in Mr. Paniwozik's summary analysis. Specifically, he testified about trading accounts he held at Goldman Sachs and an equity line of credit with National City Bank (the one at National City Bank with his wife, Phyllis). 2/21/19 Tr. 2037-2051. Importantly, though, Baldwin admitted that none of the money from the 15 investors/lenders whose funds Mr. Paniwozik traced had passed through the Goldman Sachs account. *Id.* at 2061-63. That admission is consistent with Mr. Paniwozik's summary testimony that his analysis was limited to the tracing of the investments and loans made by the 15 individuals or entities from whom the jury heard testimony at trial. The jury was well aware that Baldwin had other accounts that Mr. Paniwozik did not include in his analysis and the reason why they were not included, and Baldwin had the opportunity to argue to the jury that his analysis was flawed by virtue of their absence. The jury did not agree with Baldwin's argument, as they were entitled to do.

### III. All the Counts in the Indictment Were Properly Joined, and the Court Properly Denied Defendant's Motion for Severance.

#### A. Joinder Was Proper

Under Fed. R. Crim. P. 8(a), a defendant can be charged with two or more offenses (1) if the offenses charged are of the same or similar character, (2) if they are based on the same act or transaction, or (3) if they are connected with or constitute parts of a common plan or scheme. There is a strong policy preference in favor of

5

joinder of qualifying charges and the rule must be broadly construed toward that end. *United States v. Alexander*, 135 F.3d 470 (7th Cir. 1998). *See also United States v. Hollnagel*, 2011 WL 3471081, at *5 (N.D. Ill. 2011) (St. Eve, J.). In analyzing motions under Rule 8, courts look to the face of the indictment in determining whether joinder is proper. *See United States v. Blanchard*, 542 F.3d 1133, 1141 (7th Cir. 2008); *Hollnagel*, at *5. Rule 8 is construed broadly "in the interest of conserving judicial resources and avoiding costly, duplicative trials." *Blanchard*, 542 F.3d at 1141.

This Court properly determined that on the face of the indictment joinder here was proper because the offenses were part of a common scheme or plan. (The Court made no finding as to the other two possible bases for joinder.)[1] Defendant was charged with devising and participating in a scheme to defraud investors and lenders from about January 2006 through about May 2017. In paragraphs 1-17 of the indictment, he was alleged to have lured his investors and lenders by misrepresenting to them what he would do with their funds on their behalf, when he actually intended to use their funds for his own personal benefit. He was alleged to have moved investors' and lenders' funds among his personal and business accounts as part of his scheme, sometimes doing so despite having falsely promised that the investor would retain ultimate control of the funds. He lured his victims by exaggerating his financial success and the value of his business entities, and misrepresenting aspects

---

[1] In this response, the government does not address the additional two bases for the propriety of joinder since this Court based its ruling on the fact that at least one of the bases (common scheme or plan) was present. The government instead incorporates the arguments it made in its response to defendant's motion to sever. Dkt. No. 41.

6

of his business entities, including the existence of a compliance department, his affiliation with academic advisors, and the roles of certain individuals associated with his entities.  He was alleged to have lied to his investors about what he had done with their funds after he had obtained them, and provided them with inaccurate and sometimes fake account statements.  He was alleged to have lied to his victims about disciplinary problems he had with regulators to convince them not to demand their money back.  He was alleged to have misrepresented to his investors his efforts to recoup their money, including by exaggerating potential deals with third parties, dangling the possibility of public offerings, and claiming regulatory authorities owed him millions of dollars.  He was alleged to have lulled investors and lenders by claiming he was unable to repay their funds because he was fully invested, when in reality he had misspent and lost their money, and he continued to promise them repayment of their funds knowing he had no legitimate means to repay them.  Finally, he was alleged to have lulled investors and lenders by repaying some of their investments with money obtained from subsequent investors—a Ponzi scheme.

The evidence at trial confirmed this Court's conclusion from the face of the indictment that all the alleged offenses were connected with or constituted parts of a common scheme or plan.  In his post-trial brief, defendant does not offer any specifics to support his allegation that the alleged offenses were not part of a common plan or scheme.  Instead, he merely states that there were five separate schemes—a conclusion he bases upon groups of victims—that did not share a logical relationship or serve as a logical precursor for another.  As a general matter, defendant's emphasis

7

on different victims in the charged executions of the scheme is misplaced, because executions are simply the elements that confer federal jurisdiction under the wire fraud statute. *See United States v. Lanas*, 324 F.3d 894, 901 (7th Cir. 2003)(addressing mail fraud statute). Indeed, many schemes to defraud involve more than one victim.

The indictment alleged the scheme involved at least about 17 victims—not just the five sets referred to in the eight counts. It alleged that Baldwin engaged in many actions common to multiple victims to further his scheme over the course of its approximately 11 years, including representations about how he would use their money, what he had done with their money, and why he could not repay them. For instance, as to Counts Two and Four the evidence at trial showed that Baldwin lulled GF and LG with false explanations about why he could not repay them—in Count Two he told GF that $2.8 million of Baldwin's or his entities' funds were owed to him, and in Count Four he told LG that he could not return her funds because he was fully invested and therefore did not sit on cash. The evidence at trial proved those allegations.

The evidence at trial also proved the allegations in the indictment that Baldwin made Ponzi payments from later investors to earlier investors. Those payments constituted a thread that ran through the entire charged scheme and tied together many of the victims, including those who were referred to in the eight counts and those who were not. The trial evidence showed that some of LT/FPL's money was used to pay prior investors, and that some of LG's money was used to pay GG for

8

money Baldwin owed GG. "As in a typical Ponzi scheme, money obtained from victims of the final scam was used to placate victims of the previous three scams." *United States v. Chambers*, 157 F.3d 541, 546 (8th Cir. 1998)(determining that joinder was proper).

Various victims testified at trial about the false promises Baldwin made to them about how he would use their money and the excuses he made to them about why he could not pay them back. They testified about the lies he told them concerning the performance of their "investments," when much of the money already had been misused or lost. Meanwhile, David Paniwozik showed that Baldwin actually invested only a small percentage of the money he took in, and that even this small percentage was invested only for a short period before Baldwin used it for himself. Through its witnesses and the documents it offered, the government showed how Baldwin misrepresented to certain investors the value of his business entities, the existence of a compliance department, and the extent and role of supposed academic advisors, and how he misrepresented to them the nature of his prior disciplinary history with regulators. The evidence showed that Baldwin used some of the same entities, such as the AIA entities, the CMG entities, and Currency Clicks, to defraud multiple victims. The evidence showed that he provided similar documents, such as "debentures," to multiple investors, including GF, TE, and GG. And he sent similar emails to multiple investors about the status of their investments.

Rather than being five separate schemes, as Baldwin claims, the evidence showed that Baldwin's lies were all part of one overarching scheme to defraud many

people over more than a decade. As such, the evidence confirmed the allegations in the indictment upon which the Court properly relied in making its decision that joinder was proper.

### B. This Court Properly Denied the Motion to Sever Counts

Under Federal Rule of Criminal Procedure 14(a), a court can order separate trials of counts if it prejudices a defendant. When joinder is proper under Rule 8, a district court should grant a severance only if there is a serious risk that a joint trial would prevent a jury from making a reliable judgment about guilt or innocence. *United States v. Warner*, 498 F.3d 666, 700 (7th Cir. 2007). It is insufficient that separate trials would give defendant a better opportunity for an acquittal. *Id.*; *United States v. Rollins*, 301 F.3d 511, 518 (7th Cir. 2002).

Defendant argued that several of the counts should be severed from one another because he would have liked to testify as to the transactions upon which certain counts are based, but that he would have preferred to remain silent as to the transactions upon which other counts were based. Specifically, he asserted that he wished to testify as to his arrangement with Victim LG because it was "long and complicated" and that aspects of their arrangement were not reduced to paper in contracts or agreements, while, on the other hand, he wished to remain silent as to the claims regarding Victim GF because he argued their agreements were reduced to writing and "his best hope for acquittal as to the GF counts is to remain silent and avoid cross examination." *Id.* at 11-12.

Defendant's argument properly was denied before the trial because he made no convincing showing that he had a strong reason not to testify on certain counts. "A defendant's 'general assertions' about the testimony he seeks to offer will not suffice; he must proffer 'specific examples of the exculpatory testimony' that he would give but for the joinder of the counts." *United States v. Ervin*, 540 F.3d 623, 629 (7th Cir. 2008)(*quoting United States v. Alexander*, 135 F.3d at 477); *see also United States v. Nettles*, 476 F.3d 508, 516 (7th Cir. 2007). The evidence showed that LG invested her money with Baldwin, and that he took it, misused it, and lied about it. There was little difference between Baldwin's representations to her and his representations to the other investors. He did not claim that any testimony he would offer would undermine the dishonesty of his representations to LG about the disposition of her money and his ability and willingness to return it, and, indeed, his eventual trial testimony about LG, GF and other victims was equally unbelievable. The evidence of his fraudulent scheme was sufficient to convict him even if he had remained silent as to the aspects of this case relating to GF and other victims.[2]

Defendant's argument that he had important testimony to give on one or two of the counts was also undermined by the fact that those counts were merely executions of a larger and interrelated scheme. Defendant chose to testify, and his cross-examination properly included questions about the entirety of the scheme and

---

[2] In his pretrial motion, Baldwin said he also wanted to remain silent about his arrangement with Victim RW/BW. The government dismissed the count based on the execution of the scheme as to RW/BW shortly before trial because RW was medically unable to travel to Chicago to testify, and, as a result, the government ended up offering no evidence as to their transactions.

11

the other investor-victims, including questions about how the funds were invested, misrepresentations he made to the victims, and the source of funds used to repay victims. Defendant could not have testified only about LG and stayed silent as to the others. Defendant's argument did not even address the government's proper cross-examination concerning victims of this scheme who are not referred to in any of the executions.

As before, defendant's reliance on *United States v. Archer*, 843 F.2d 1019 (7th Cir. 1988), is misplaced. The Seventh Circuit stated that severance is not mandatory every time a defendant wishes to testify as to some counts but remain silent as to other counts. *Archer*, 843 F.2d at 1022. "If that were the law, a court would be divested of all control over the matter of severance and the choice would be entrusted to the defendant." *Id.* (*quoting United States v. Peters*, 791 F.2d 1270, 1287 (7th Cir. 1986)). While recognizing that sometimes severance may be appropriate where circumstances can coerce a defendant into testifying on a count when he wishes to remain silent, the need for severance does not arise "until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other." *Archer*, 843 F.2d at 1022 (internal quotation marks and citation omitted).

As this Court found, Baldwin offered an insufficient basis to claim that he needed to testify as to certain counts but remain silent as to others. Defendant's counsel said only that there was no need for Baldwin to testify about GF, but she did not explain why there was a strong need for him not to testify about it. This Court

properly concluded that Baldwin did not provide an adequate basis for permitting him to pick and choose what topics he would discuss on the witness stand; and the evidence was so strong that defendant still would have been convicted had he limited his testimony only to certain victims and transactions.

Defendant's additional argument that severance was warranted because the amount of evidence would lead the jury to believe that "the amount of smoke must mean there is a fire" and the jury would be left with "a huge amount of evidence about unrelated charges," Def. Motion to Sever, Dkt. 35, at 12, was also properly rejected by this Court. Putting aside defendant's error in claiming these are all unrelated charges, this Court's instruction to the jury to consider each count separately properly insulated the jury from any possible spillover effect. *See United States v. Davis*, 724 F.3d 949, 956 (7th Cir. 2013).

### IV. Evidence Regarding Transactions With Victim TE Was Properly Admitted

The transactions between Baldwin and Victim TE were admissible as direct evidence of the scheme, and the evidence of them was not offered under Fed. R. Evid. 404(b). A scheme can extend beyond the five years preceding the indictment, as long as executions of the scheme occur within five years of the indictment being returned. *See United States v. Lanas*, 324 F.3d 894, 901 (7th Cir. 2003). "[A] fraud scheme can produce proceeds long before the act that ultimately triggers jurisdiction." *Id.*

The indictment alleged a scheme to defraud from in or about January 2006 through in or about May 2017. Dkt. 1 at ¶ 2. The evidence at trial showed that the three transactions involving Victim TE totaling nearly $750,000 were all part of the

13

charged scheme. TE gave Baldwin that money to invest for her, and Baldwin traded a portion of that money for a matter of months and then used much of the money for himself. Baldwin provided TE the same sort of "debenture" documents he provided other victims, including GF, and he offered to roll her investment money into Currency Clicks, a Baldwin-controlled entity described in Paragraph 1 of the Indictment that he used as a vehicle to fraudulently obtain money from other investors as part of this charged scheme. In March 2015, Baldwin returned $75,000 to TE in the form of a Ponzi payment of money Baldwin had obtained from Victim FPL/LT.

The three transactions involving TE were part of the charged scheme, and therefore evidence of those transactions was direct evidence of the charged scheme and not subject to admission under Rule 404(b). "The mailing . . . . merely provides the prerequisite to federal jurisdiction over the scheme to defraud. The government is entitled to prove the scheme itself, and that proof is not bounded by the timing of the mailing." *United States v. Boone*, 628 F.3d 927, 934 (7th Cir. 2010). *See also United States v. Longfellow*, 43 F.3d 318, 325 (7th Cir. 1994). This same logic applies to transactions relating to a number of investors who were not referenced in any of the executions and whose transactions with Baldwin occurred more than five years before charges were brought.

Because the transactions with TE were part of the charged scheme, evidence of those transactions was direct evidence of the scheme under Rule 401, and did not need to be admitted pursuant to Rule 404(b).

## CONCLUSION

For the foregoing reasons, the United States respectfully requests that the Court deny the defendant's post-trial motions.

Respectfully submitted,

JOHN R. LAUSCH, JR.
United States Attorney

By: /s/ *Matthew M. Getter*
MATTHEW M. GETTER
HEIDI MANSCHRECK
MICHELLE PETERSEN
Assistant United States Attorneys
219 S. Dearborn Street, 5th Floor
Chicago, Illinois 60604
(312) 886-7651
(312) 469-6205
(312) 886-7655

Dated: August 19, 2019