UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>SHAWN BALDWIN | No. 17 CR 787<br><br>Judge John Robert Blakey |

**GOVERNMENT'S SENTENCING MEMORANDUM**

The UNITED STATES OF AMERICA respectfully submits the following sentencing memorandum, and recommends a sentence within the applicable Guidelines range.

**ARGUMENT**

**I. Introduction**

Defendant was charged with eight counts of wire fraud in connection with a scheme to defraud investors and lenders of millions of dollars over about a 10-year period. Defendant proceeded to trial. During the course of the approximately three-week trial, dozens of witnesses, including numerous victims of the defendant's scheme, testified. The defendant also testified on his own behalf over the course of about two days. The jury clearly did not believe his testimony, and he was convicted on all seven counts that were presented to the jury. The Probation Department agrees with the government's calculation

of the applicable Guidelines range as being 262-327 months' imprisonment.[1] It is the government's position that a sentence within the applicable Guidelines range is reasonable and appropriate.

## II. Nature and Circumstances of the Offense

This Court is familiar with the facts of the case, as it presided over a trial that featured about 40 witnesses, including most of the victims, and more than 200 exhibits. The evidence proved that while defendant touted himself as an accomplished financier, entrepreneur and investment advisor, he was, in reality, none of those things. Defendant inflated to his victims his credentials, his investment portfolio, and his connections. He convinced friends, acquaintances, and even childhood friends to trust him with their money based on his representations that he would invest it on their behalves in certain equities or businesses of his own. In some cases, he convinced victims to provide funds multiple times by painting a rosy – but completely fictitious – picture of how well their initial investments had done.

The unfortunate reality is that defendant invested only a small percentage of the more than $10 million with which he was entrusted. He spent most of the money on himself, including exotic travel, meals, clothes, movie theater tickets, jewelry, tuition, and huge sums of cash withdrawals for

---

[1] The government set forth the applicable Guidelines calculations in the Government's Version of the Offense.

which there is no record of how he spent it. And the money he did invest for his victims was quickly lost before he used the remaining money for himself. When he found a successful and trusting victim in Europe who was willing to provide him with millions of dollars in cash and stock, he used those millions for himself and to make Ponzi payments to prior investors and lenders. He also misappropriated the stock and lied about where it was being held, including through the use of a fake account statement he created. He used some of the money to travel to places where he would socialize and take photos with people who really were successful and thereby try to create for himself an image of a successful and connected financier. When confronted by his victims, he doubled down on his lies and misrepresented to them what he had done with their money, the success of his supposed investments, and why he could not return their funds to them.

Defendant's fraudulent scheme persisted over the course of more than 10 years and included more than 20 victims. During that time, the victims changed, the names of his investment vehicles changed, and the supposed purposes to which he said he would put their money changed. What remained consistent throughout the scheme, however, is that he had no legitimate source of income, and rather than investing the funds as he said he would, he used these victims' funds to support a lavish lifestyle for himself.

### III. History and Characteristics of the Defendant

The arc of defendant's life over at least the past 14 years has been characterized by abject dishonesty. Defendant lied to his victims to get their money, making bold and untrue assertions about his plans for their money, about what he had done with their money, about the value of their investments, about the value of his businesses, about his efforts to refund their money, and about the reasons he could not give them back their money. He preyed upon people who were vulnerable and trusting. He took the life insurance proceeds of his friend's widow that she had earmarked for her children's education. He took the money of his childhood friend who owned a day care center and was a pastor. He took the money of a psychology professor who had just sold her condo and wasn't sophisticated about investments. He took the money of a young woman from England looking to make connections in Chicago. Defendant's crimes were neither isolated nor impulsive; day after day, year after year, defendant chose to lie to victims, always seeking more and more "investment" funds. Defendant moved from one victim to another, using their money to continue traveling in style around the world to sustain a false image of a successful financier in order to help find new victims and enjoy an extravagant lifestyle.

Throughout the entire scheme, there is no evidence that defendant earned a single honest dollar, despite being an educated man with a supportive

4

family. Yet he went to great lengths to build a façade of success. He used his victims' money to purchase clothes for himself and his young interns and associates, jewelry, and even expensive pens, and to travel internationally and network. For instance, he took over $200,000 in investor money claiming that it would be for Currency Clicks. Then he hired a reputable former executive of the Chicago Mercantile Exchange for the business to convince others that the business was legitimate, when in reality there was never anything for the executive to do and he never was paid before he quit about three weeks later. He also used a handful of emails with a contact at Stock Twits to suggest to investors that he was working on a deal with a legitimate company, when in reality there were no serious negotiations occurring and defendant's brief email of interest was quickly rejected out of hand by Stock Twits.

His dishonesty continued through the course of the trial. Even when he was sworn with a solemn oath to tell the truth to the jury and to this Court, he lied repeatedly, about having prepared and emailed a fake Merrill Lynch account statement, about what he told investors concerning having "acquired" shares in Palantir and Jawbone, about what LG's $450,000 investment was for, and about his entitlement to $2.8 million in frozen funds. Defendant lies and deceives with no hesitation and with no remorse. It appears he knows no other way.

5

## IV. The Need for Deterrence, Protection of the Public, and Respect for the Law

There is nothing in the record to indicate that defendant ever will change his ways. He was disciplined and finally expelled or barred by regulators multiple times during the course of this scheme. Instead of learning from those sanctions, defendant doubled down. He blamed the regulators for being out to get him and for being dishonest. He told people that his regulatory troubles were minor and the result of their bad faith. He even went so far as to tell one victim that a regulatory agency owed him about $2.8 million, which of course was untrue. Each reprimand from a regulator was an opportunity for him to stop, reflect, and change his ways. His failure to do so requires a sentence that allows for specific deterrence.

Despite his storied history of misconduct and dishonesty, he still blames others for his situation. He has blamed supposedly overzealous and dishonest regulators for his sanctions; he has blamed the Face Book IPO for his financial troubles; and he has even blamed victims for causing his problems. Defendant harbors a profound sense of grievance for any problems he has faced. Rather than accept responsibility for his conduct, he continues to insist that *he* is the victim.

It is important to impose a sentence conveying to investment advisors— and to those who pretend to be investment advisors—that there will be

significant penalties for lying to and stealing from their clients.[2] But the need for specific deterrence as to this defendant is far greater.

To this day, defendant has never shown a shred of remorse for the harm he caused to others. In fact, it appeared from his testimony at trial that he feels no remorse, shame or even the slightest empathy for anyone other than himself. Defendant has shown nothing to suggest that he will change his ways in the slightest upon his release from prison. Given his history of flouting laws and regulations—including lying before this Court—a lengthy period of imprisonment, as contemplated by the Sentencing Guidelines, is necessary to protect the public, to sufficiently deter him from future crimes, and to promote respect for the law. Defendant will remain a dangerous con artist as long as he has the means to do so. As such, society needs to be protected from him for as long as possible.

## V.     Restitution

Pursuant to 18 U.S.C. § 3663A, defendant is required to pay restitution to the victims of his fraudulent scheme in an amount to be determined at

---

[2] Indeed, individuals considering engaging in investment fraud may conclude that a high financial award and a low risk of detection and prosecution make investment fraud worthwhile. To deter such conduct, the penalty for those caught must be sufficient to alter this risk calculus—as the Seventh Circuit has recognized. *See United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it.").

sentencing. The government previously submitted a chart showing the victims and the amounts the government believes they are owed.

## VI. Supervised Release Terms

The government has no objections to the terms of supervised release proposed by the Probation Department.

## **CONCLUSION**

For the foregoing reasons, the United States respectfully requests that the Court impose a sentence within the applicable Guidelines range.

                Respectfully submitted,

                JOHN R. LAUSCH, JR.
                United States Attorney

By:  /s/ *Matthew M. Getter*
      MATTHEW M. GETTER
      HEIDI MANSCHRECK
      MICHELLE PETERSEN
      Assistant United States Attorneys
      219 S. Dearborn Street, 5th Floor
      Chicago, Illinois 60604
      (312) 886-7651
      (312) 469-6205
      (312) 886-7655

Dated: March 5, 2020