**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **Plaintiff,** | ) | **No. 17 CR 787** |
| | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **The Honorable John R. Blakey** |
| | ) | |
| **SHAWN BALDWIN** | ) | |
| | ) | |
| **Defendant,** | ) | |
| | ) | |

**SHAWN BALDWIN'S OBJECTIONS TO THE PRESENTENCE**
**INVESTIGATION REPORT AND SUBMISSION WITH RESPECT TO**
**SENTENCING FACTORS SET FORTH IN 18 U.S.C. § 3553**

CAROLYN PELLING GURLAND
THOMAS CULL
CHRIS JESKE
WHITE & CASE LLP
111 South Wacker Drive
Suite 5100
Chicago, IL 60606
(312) 881-5405
Carolyn.gurland@whitecase.com
Thomas.Cull@whitecase.com
Chris.Jeske@whitecase.com

*Attorneys for Defendant Shawn Baldwin*

# **TABLE OF CONTENTS**

**Page**

I.  Objections to the Advisory Guideline Computations in the Government's Version of the Offense and in the PSR. ........................................................................................... 2

    a.  The Government Has Failed To Meet Its Burden of Establishing Guideline Loss for the ROK Shares. ........................................................................................................... 2

        i.  Baldwin Treated the ROK Shares Exactly As He Agreed with Tenuta to Treat the ROK Shares. .................................................................................................... 3

        ii.  Application of Advisory Sentencing Guidelines "Loss" Concepts Confirms that the Government Has Failed to Establish a $5,295,675 Loss Figure for the ROK Shares. ....... 5

        iii.  The Government's "Loss Calculation" for ROK Shares Is Speculative, Unreliable, and Unsupported by the Evidence. .......................................................................... 8

        iv.  Publicly Available Market Data Reveals that the ROK Shares Were Worth, If Anything, Only a Fraction of the Government's Estimated Value. ................................. 12

            A.  Loss To Futura/Saudi Investments ...................................................... 12

            B.  Loss Attributable To Decrease in Market Value Should Not Be Counted. .................... 13

            C.  Loss Calculation ............................................................................ 13

II.  The Factors Set Forth in 18 U.S.C § 3553(a) Justify A Below Guidelines Sentence. .................. 14

    a.  Nature and Circumstances of the Offense: 18 U.S.C. § 3553(a)(1) ........................................ 15

        i.  Baldwin Believed That His Business Would Be Successful and that He and His Investors Would Make Money .................................................................................. 15

        ii.  Trial Testimony Regarding Baldwin's Status in the Investment Community ................. 21

        iii.  Trial Testimony Regarding Baldwin's Efforts To Make His Business Successful ......... 23

        iv.  Documentation of the Investments Disclosed Risks and/or Did Not Significantly Restrict Use of the Money. .................................................................................... 24

        v.  Luca Tenuta's Testimony Was So Filled With Inconsistencies and Absurdities and Loss to Tenuta and Futura Should Be Viewed Skeptically. ........................................ 28

        vi.  There Were Significant Omissions in the Testimony of Government Expert Paniwozik ........................................................................................................ 31

    b.  Baldwin's History and Characteristics: 18 U.S.C. § 3553(a)(1) ............................................ 34

        i.  Baldwin's Personal Background ........................................................................ 34

        ii.  Family Members Attest To Baldwin's Kindness. Compassion and Good Character. ...... 37

        iii.  Baldwin's Charitable Contributions to the Community ................................................ 38

        iv.  Avoidance of Unwarranted Sentencing Disparities forSimilarSituated Defendants ........ 41

III.  Supervised Release ..................................................................................................... 43

## BACKGROUND

Shawn Baldwin ("Baldwin") comes before this Court for sentencing in connection with his conviction after a jury verdict, on February 26, 2019, to Counts One through Four and Six through Eight of the Indictment (with Count Five having been withdrawn by the government). Baldwin was remanded to custody following the jury verdict on February 26, 2019 and has been incarcerated at the Metropolitan Correctional Center since that date.

The government alleged that Baldwin engaged in a scheme to defraud investors by "taking their money under the guise of investing the money or using it for a corporate purpose." Presentence Investigation Report (Nov. 19, 2019) ("PIR") ¶ 17. Nevertheless, the government acknowledged, as it had to, that Baldwin invested approximately 25% of the funds he obtained. *Id.* ¶ 18. The evidence at trial, as will be discussed in more detail below, further established that Baldwin set up a working office with phones, internet, staff, and office furniture, that he worked long hours either in the office or attending meetings and conferences, that he ran and attended numerous financial conferences, and that he set out to (and did) attract top people in the financial sector to participate in his ventures.

Faced with this information and intent on constructing a picture of Baldwin, an admittedly knowledgeable financier, successful investor, and prominent member of the African American community as a complete fraud and fiction, the government presented the incomplete and variously misleading analysis by their FBI expert, David Paniwozik ("Paniwozik"). Paniwozik characterized funds in the various accounts he reviewed as investor funds despite the fact that records available to Paniwozik—which he denied having reviewed and did not include in his financial analysis—revealed that hundreds of thousands of dollars of Baldwin's money was placed in the investor accounts. Paniwozik's analysis also failed to distinguish among individuals who provided Baldwin with funds pursuant to a loan agreement, setting forth that the funds could be

used for "any lawful purpose of the borrower [Baldwin]," investors who entered into subscription agreements for Currency Clicks, many of whom dealt exclusively with Al Brown, investor Luca Tenuta whose testimony was filled with inconsistencies and absurdities, and other investors. Thus, despite the fact that Paniwozik testified that Baldwin's largest expenditures were from travel and hotels and despite the fact that testimony established that Baldwin was working and attempting to build financially successful companies between 2006 and May 2017, Baldwin was portrayed as worse that a Ponzi scheme fraudster, who made zero effort to achieve financial success and simply absconded with people's money. The facts in this case are far less clear-cut and a more nuanced understanding of both Baldwin and this case is required in order to achieve a just and appropriate sentence.

I.  **Objections to the Advisory Guideline Computations in the Government's Version of the Offense and in the PSR.**

    a.  **The Government Has Failed To Meet Its Burden of Establishing Guideline Loss for the ROK Shares.**

The largest component of the loss figure set forth in the PIR is the alleged $5,295,675 loss from the shares in ROK Stars, LLC ("ROK"). PIR p. 7 ¶ 19. This figure should not be included in guideline loss because the government has not come close to meeting its burden to provide a reliable valuation for the ROK shares or a viable theory as to how Baldwin either caused or intended to cause a loss of $5,295,675 to Futura.

Government expert Paniwozik obtained the $5,295,675 valuation from "the bank account." Tr. 1269. The Government Version of the Offense ("Government Version") provides that the loss calculation for the ROK is based on an "estimated market value" obtained from Merrill Lynch Portfolio Summary for one month, August 2014. *See* Government Version pp. 15-16. The government has failed to meet its burden of establishing the $5,295,675 loss figure it claims. First, the government has not established that Baldwin took any action with the ROK shares by the

August 2014 date of its $5,295,675 valuation that was in any way inconsistent with exactly what he and Tenuta agreed would be done with the shares. Second, to the extent the ROK shares declined from a top value of 5,295,675 to a negligible value, the condition of the market, and not Baldwin, was the cause of that decline in value. Third, even according to Merrill Lynch documentation, the "estimated market value" obtained from a Merrill Lynch Portfolio Summary for one month, August 2014, was an unreliable valuation, as confirmed by the trading volume of the ROK stock which could never have justified an assumption of a $5,295,675 value for that stock.

### i. Baldwin Treated the ROK Shares Exactly As He Agreed with Tenuta to Treat the ROK Shares.

The genesis of the transaction involving the ROK shares was the relationship between Luca Tenuta and Baldwin. Tenuta testified by video from London for the trial over the objection of the defense. Tenuta testified that the ROK shares had been purchased by Michael Winston Stevens ("Stevens") who created the investment vehicle Futura. Tenuta Transcript ("Tenuta Tr.") 8.[1] Tenuta explained that Stevens had put a lot of money into the ROK stock, but that *there was no trading volume in the stock that would have allowed Stevens to liquidate his position in the stock and to generate cash or profit.* Tenuta Tr. 41-42. (emphasis supplied) Tenuta and Baldwin discussed a way to use the ROK shares that would not place the stock at risk, which, according to Tenta's testimony, meant that Baldwin would not pledge the stock as a guarantee. Tenuta Tr. 42. The agreement as to what Baldwin was and was not supposed to do with the ROK shares was set forth in Government Exhibit ("Gov. Ex.") 189, an email from Baldwin to Tenuta dated March 25, 2014. In that email, Baldwin explained that he could put low volume shares such as the ROK

---

[1] Witness Tenuta testified through videoconference. The numbering of the transcript of his testimony is different from the rest of the transcribed proceedings. For ease of reference, all citations to Tenuta's testimony will be cited as "Tenuta Tr."

shares into an account for trading leverage. Gov. Ex. 189 p. 1. In the email, Baldwin explained to Tenuta that the ROK shares would not be placed at risk by this arrangement because "they are not being liquidated and have not been pledged for the account." *Id.* Baldwin further explained to Tenuta that he was offering this arrangement to Tenuta's client Futura because Futura was opening up a cash account with Baldwin at AIA. *Id.* Tenuta testified at trial that he understood that the ROK shares would be in an omnibus account not specific to Futura. Tenuta Tr. 64, 192-93. The only condition Tenuta testified to regarding the ROK shares was that they would not be "in any danger of being encumbered." Tenuta Tr. 192-93.

Clear from the email from Baldwin to Tenuta was that Baldwin was going to place to ROK shares in Baldwin's AIA account. Baldwin states under "Method," "Place securities in the AIA Research brokerage account…" Gov. Ex. 189. Likewise, under "Set Up Procedure", Baldwin discloses to Tenuta that Futura will place "securities with AIA research for placement in an institutional account." *Id.*

In a June 16, 2014 letter from Baldwin to Tenuta, Baldwin explains to Tenuta the plan to leverage the ROK shares to trade in a brokerage account on margin. Baldwin states in the letter that he is concerned that the stock price of the ROK shares is already at only one Euro per share and that it was continuing to slide. Gov. Ex. 126. The transfer agreement confirms that, just as Baldwin and Tenuta had discussed, on July 8, 2014, the ROK shares were transferred from Monredon Ltd. to AIA Group, LLC. Gov. Ex. 128 p. 3. By July 10, 2014, Baldwin was able to confirm to Tenuta that the ROK shares were at Merrill Lynch in an AIA Group account. Gov. Ex. 129. Government witness Sanel Behlic of Merrill Lynch testified that Baldwin was the one who requested the movement of the ROK shares to Baldwin's AIA account. Tr. 1221-22. Behlic could

not have been aware of and did not testify about the detailed discussions between Tenuta on behalf of Futura and Baldwin in advance of the movement of the ROK shares to the AIA Group account.

Behlic testified that at the end of August 2014, the current valuation of the ROK shares was $5,295,675, but that by the period August 2014-September 2014 there could be no value attributed to the ROK stock. Tr. 1223. Similarly, in the October 2014 to November 2014 period, according to Behlic, there could be no value attributed to the ROK shares. Tr. 1224. Behlic testified that in November 2014, and at a time when no value whatsoever could be attributed to the ROK shares, they were transferred out of the Merrill Lynch account. Tr. 1224. Ronald Arimenta testified that Fifth Third bank received the ROK shares on November 7, 2014. Tr. 1205. The ROK shares were again transferred to the Merrill account on November 6, 2015 and transferred out again on December 7, 2015. Tr. 1234. According to Tenuta, he did not know the mechanics but was aware that the ROK shares were eventually returned to Stevens. Tenuta Tr. 145.

Baldwin placed the ROK shares in an omnibus account with AIA precisely as he discussed with Futura. As outlined above, both Tenuta's testimony and the documentary evidence in the case supports that fact. Conversely, there is zero evidence that the shares were pledged as guarantee or otherwise encumbered. In these circumstances, as of August 2014, the only month that the shares could even possibly (although unreliably) be said to be worth $5,295,675, there was zero evidence that Baldwin either actually deprived Futura of the value of the shares or that he intended to deprive Futura of the value of the shares.

> ### ii. Application of Advisory Sentencing Guidelines "Loss" Concepts Confirms that the Government Has Failed to Establish a $5,295,675 Loss Figure for the ROK Shares.

Under the Advisory Sentencing Guidelines, "loss" is defined as "the greater of actual loss or intended loss." USSG §2B1.1 cmt. n.3(A). "'Actual loss' means the reasonably foreseeable pecuniary harm that resulted from the offense." USSG §2B1.1 cmt.

n.3(A)(i). "Reasonably foreseeable pecuniary harm" means loss that the defendant knew or reasonably should have known "was a potential result of the offense. USSG §2B1.1 cmt. n.3(A)(iv). Determining whether a loss was reasonably foreseeable requires a but for and proximate causation analysis. *United States v. Burns*, 843 F.3d 679, 688 (7th Cir. 2016); *United States v. Domnenko*, 763 F.3d 768, 777 (7th Cir. 2014); *United States v. Whiting*, 471 F.3d 792, 802 (7th Cir. 2006).

An intended loss analysis turns upon how much loss the defendant actually intended to impose rather than the amount, in fact, lost. Under an intended loss analysis, the district court must find, by a preponderance of the evidence, that the defendant intended to impose the particular amount of loss for which he is to be sentenced. *United States v. Higgins*, 270 F.3d 1070, 1075-76 (7th Cir. 2001). In either event, whether determining actual or intended loss, the loss must be tied to the defendant's offense. In cases involving fraud, "[t]he loss must be the result of the fraud as opposed to other, non-fraudulent occurrences." *United States v. Rigas*, 583 F.3d 108, 120 (2d Cir. 2009); *see United States v. Olis*, 429 F.3d 540, 547 (5th Cir. 2005) (explaining that numerous factors, not just defendant's fraud, contributed to stock price decline).

With respect to actual loss, the Court should exclude the value of ROK shares from its loss calculation because Baldwin's conduct was neither the actual nor the proximate cause for any loss associated with their value. Even before receiving the shares, Baldwin informed Tenuta that the shares were illiquid and the price was dropping precipitously due to market forces. Gov. Ex. 126. The government acknowledged this fact in Baldwin's FBI interview. The agents stated: "[s]o, you said, you know we–I've asked you a couple times about the ROK shares. I know they're not worth what they once were worth *because of certain market reasons*…." FBI Interview, 12/11/2017 at 15:30. (emphasis supplied).

6

The government also has not alleged that Baldwin's conduct had any effect whatsoever on the ROK share value. On the contrary, consistent with the terms of the agreement between Baldwin and Futura, Baldwin did not sell, pledge or encumber a single ROK share. Nor did Baldwin's retention of the ROK shares in an account cause any loss or depreciation in value because, as set forth below, there was no market for ROK shares and no means of selling them.

Nor has the government established intended loss when there has been no evidence that Baldwin acted inconsistently with the treatment of the ROK shares that he agreed upon with Tenuta on behalf of Futura. To the extent that the government would seek to rely on Baldwin's post August 2014 movement of the shares to and from different accounts (a theory that the government has not articulated in its filings), this theory also fails. After August 2014, there is no valuation for the shares that can even be applied according to the government's own witness from Merrill Lynch and the movement of the ROK shares to the Fifth Third account did not occur until November 2014, a time when there had not been any reliable valuation for the shares for 2 months. Furthermore, there has been no evidence that Baldwin's movement of the ROK shares after a time that they had no value was intended to have been a theft of the shares. A more plausible theory given the lack of a market for the shares was that Baldwin intended to keep the shares in another trading account to provide the same leverage for other margin trading as he and Futura had agreed upon when the shares were maintained in the AIA omnibus trading account at Merrill Lynch.

Under similar circumstances, the Seventh Circuit has rejected the argument that the government has advanced in this case. In *United States v. Higgins*, the defendant pleaded guilty to bank fraud for supplying two bad checks to a Lexus dealer for the purchase of two automobiles. 270 F.3d 1070, 1072 (7th Cir. 2001). One check for $69,900 was for the purchase of the care and the second, a $420,000 check from a bank account that had since been closed, was to evidence his

ability to pay. At sentencing, the district court concluded that loss was in the amount of the $420,000 false check that defendant presented to the dealer. *Higgins*, 270 F.3d at 1076. The Seventh Circuit disagreed, stating:

> These findings are too vague to support a conclusion that Higgins intended to inflict loss in the full amount of the $ 420,000 check. There is no indication that the district court believed that Higgins intended to actually deprive ONB of the full $420,000 he purported to be depositing, as opposed to merely impressing the bank with his importance and then using some smaller sum as he did with the Lexus purchases. If anything, the district court's statement leaves the impression that Higgins intended to impose $69,990 of loss on ONB and that the primary purpose of the $420,000 figure was simply to deceive Kenny Kent Lexus.

*Id.*

The facts in *Higgins* are analogous to those in this case. Like Higgins, Baldwin's use of the (questionable) value of the ROK shares was to establish that he had financial wherewithal. Like Higgins, Baldwin made no move to actually obtain the value of this pledged collateral or to liquidate it. Indeed, this case is a stronger case for refusing to apply the loss amount of the pledged collateral because unlike the *Higgins* case in which a $420,000 check can be reliably valued at $420,000, according to the government's own witnesses, there was no reliable value that could be attributed to the ROK shares after August 2014. *See* Tr. 1223-24.

### iii. The Government's "Loss Calculation" for ROK Shares Is Speculative, Unreliable, and Unsupported by the Evidence.

Although the Guidelines require only that the Court "make a reasonable estimate" of a loss given the available information, upon challenge, the government "bears the burden of supporting its loss calculation with reliable and specific evidence." *United States v. Ring*, 811 F. Supp. 2d 359, 380 (D.D.C. 2011). The government may not provide a calculation based on mere speculation. *United States v. Gupta*, 463 F.3d 1182, 1200 (11th Cir. 2006); *United States v. Cuti*, No. 08-cr-972, 2011 U.S. Dist. LEXIS 84791, at *12-13 (S.D.N.Y. July 29, 2011) (observing that,

while the court "need only make a reasonable estimate of the loss, given the available information," it "may not engage . . . in 'pure speculation.'").

The sole basis for the government's claim of $5,295,675 loss from the ROK shares was the August 2014 Merrill Lynch Portfolio Statement. Gov. Ex. 24B. A closer examination of the Portfolio Summary reveals why the government's reliance on this figure is fundamentally flawed and its loss calculation grossly overinflated.

Page six of the August 2014 Portfolio Summary includes a disclaimer on market valuations, which provides in pertinent part:

Pricing and Valuations

While we believe our pricing information to be reliable, we cannot guarantee its accuracy. Pricing information provided for certain thinly traded securities may be stale….

Unless otherwise indicated, and except for certain alternative investment funds sponsored by affiliates of MLPF&S [Merrill Lynch],[2] the value shown on this statement for an investment in these securities has been provided the the management administrator or sponsor of each program or a third-party vendor, in each case without independent verification by [Merrill Lynch]. This value represents their estimate of the value of the investor's interest in the net assets of the program, as of a date no more than 18 months from the date of the statement. **Therefore, the values shown may not reflect actual market value or be realized upon a sale.**

Gov. Ex. 24B p. 6 (emphasis added). Thus, the only evidence the government relied upon in support of his conclusion that the ROK shares were worth $5,295,675 was an unverified "estimated market value" provided by an unknown administrator or sponsor up to 18 months before the date of August 2014 Portfolio Summary statement. Even more importantly, the final sentence in this paragraph—"the values shown may not reflect actual market value or be realized upon a sale"— explicitly disclaims the purpose for which the government offers this evidence.

---

[2] The government did not introduce evidence at trial or in the Government Version to establish that the ROK shares were sponsored by Merrill Lynch affiliates. The defense is not aware of any such evidence.

The data underlying the Portfolio Summary further demonstrate that the government's reliance on Merrill Lynch's "estimated market value" is manifestly unreasonable. Trading activity reveals the ROK shares are precisely the same "thinly traded securities" identified in the Portfolio Statement disclaimer and for which pricing information may be "stale." *Id.* For example, for July 2014 to August 2014 there were only four trades of ROK shares on the Stuttgart exchange. *Financial Times*, ROK Stars PLC, [FT.com](FT.com), [https://markets.ft.com/data/equities/tearsheet/historical?s=RKS:STU](https://markets.ft.com/data/equities/tearsheet/historical?s=RKS:STU) (last visited Mar 4, 2020).[3] This sparse trading activity is hardly an outlier. According to trading information provided by the Financial Times, in a ten-month period from July 1, 2014 to April 30, 2015, there were 19,950 ROK shares sold *on the entire Stuttgart exchange*. *Id.* This activity reveals that the ROK shares are "thinly traded" and, as the Merrill Lynch disclaimer states, the information provided is "stale" – i.e. unreliable. *Ring*, 811 F. Supp. 2d at 380 (stating that the government "bears the burden of supporting its loss calculation with reliable and specific evidence.").

Behlic, the government's witness and a Merrill Lynch market supervision manager, conceded that Merrill Lynch's ability to even *estimate* market value (much less an accurate market value) is limited, at best. During direct examination, Behlic testified:

> Q. Further down in that stack of documents, do you see a statement for the month of August -- excuse me, for August 30th, 2014, to September 30th, 2014?
>
> A. Yes.
>
> Q. Is it the same client account?

---

[3] Because the Financial Times is a paid-for subscription service, the content may not be viewable to all readers at the link provided. Accordingly, Exhibit A to this brief is a PDF document showing the same data. The share volume reported on the attached PDF has a typographical error and reports share volume twice. For example, page one of the exhibit reflects that 900 shares were sold on Thursday April 23, 2015 but reports this figure as "900900.00." Similarly, on Thursday December 19, 2014 the 3,870 shares sold is listed as "3,8703.87k." This error does not appear on the live webpage, linked to above.

A. It is.

Q. For that month of September, what does it indicate are still the assets in the account?

A. There's still 2,450,000 shares of ROK Stars PLC.

Q. Now is there a value attributed to the ROK Stars shares in this September account statement?

A. No.

Q. Do you know why?

A. Sometimes we can't determine the market value of a particular share, and that's when we just indicate it as, "N/A." We can't find a value.

Tr. 1223 (discussing Government Exhibit 24B). Merrill Lynch's inability to estimate the market value of the ROK shares in September 2014 is understandable because *not a single ROK share was sold for this period*. *Financial Times*, ROK Stars PLC, [FT.com](FT.com), [https://markets.ft.com/data/equities/tearsheet/historical?s=RKS:STU](https://markets.ft.com/data/equities/tearsheet/historical?s=RKS:STU) (last visited Mar 4, 2020). Behlic also testified that Merrill Lynch could not estimate the value of the ROK shares for the following month, October 2014. Tr. 1223. Thus by the time the ROK shares were transferred out of the Merrill account in November 2014, they had an indiscernible value, most likely no value, and had not had any reliable value for months (if ever). Tr. 1224.

The government's reliance on Merrill Lynch's estimated market value for thinly traded shares in a single monthly statement—for a month in which the ROK shares were exactly where thy were supposed to be doing exactly what they were supposed to be doing (i.e. providing trading leverage)—is improper and its loss estimate is unreasonable.

### iv. Publicly Available Market Data Reveals that the ROK Shares Were Worth, If Anything, Only a Fraction of the Government's Estimated Value.

The government's loss calculation ignores the ROK stock price, market forces, and the illiquidity of the 2,450,000 ROK shares. From July 1, 2014 to April 30, 2015, there were approximately 19,950 ROK shares sold on the entire Stuttgart exchange. *Financial Times*, ROK Stars PLC, FT.com, https://markets.ft.com/data/equities/tearsheet/historical?s=RKS:STU (last visited Mar 4, 2020). During that period, the ROK shares reached their highest valuation in mid-August 2014, when a total of 1,500 ROK shares sold for 1.65 euros per share.[4] *Id*. Since then, the ROK share price dropped precipitously due to market forces. For many trading days, ROK shares sold for virtually nothing. For example, on July 6, 2016, 23,000 shares sold for no more than 0.06 euros per share.[5] On May 11, 2016, 20,000 ROK shares sold for no more than 0.085 euros per share. And on March 24, 2016, 3194 shares sold for no more than 0.05 euros per share. Even when larger trades of ROK shares were executed, the share price was only a fraction of that proposed by the government. The government valuation is unreasonable.

### A. Loss To Futura/Saudi Investments

According to the Government Version, inflows of funds from Futura were comprised of: (1) wire of $1 million in June 2014; (2) wire of $ 1 million in September 2014; (3) wires from Futura in January and February 2015 totaling $1 million; (4) a wire of $500,000 from Saudi Investments on January 28, 2015; and (5) a wire of "just under" $500,000 on March 20, 2015. Government Version pp. 16-17. The total of these wires was $4 million. However, Baldwin

---

[4] The purchase price of each share is unknown. However, we have assumed that each share sold was sold for the reported "daily high" ROK share price on the respective day the shares were traded. This assumption provides for the maximum possible value received for trades involving ROK shares.
[5] The "daily high" reported for ROK shares on this date is 0.06 euros. *Financial Times*, ROK Stars PLC, FT.com, https://markets.ft.com/data/equities/tearsheet/historical?s=RKS:STU (last visited Mar 4, 2020).

returned $1 million "right away" after receiving the September 2014 wire and also returned an additional $700,000 to Futura and or Saudi Investments. The $4 million total of the wires less the $1,700,000 Baldwin returned to Futura and Saudi Investments totals $2,300,000 which approximates the $2,304,325 figure that one can arrive at from the chart at page 7 of the PIR.[6]

### B. Loss Attributable To Decrease in Market Value Should Not Be Counted.

According to the government's exhibits, certain investors lost money due to a decrease in market value in their investment accounts. Gov. Ex. S-24, S-25, S-26, S-29. Baldwin is not the cause of market factors and should not be responsible for these amounts. Twana Edwards lost $34,800 due to decline in the market value of her investments between August and December of 2011. Gov. Ex. S-24. She lost another $36,000 due to decreased market value from trading between November 2010 to April 2011. Gov. Ex. S-25. She lost an additional $27,600 from decreased market value from trading between August 2010 and April 2011. Gov. Ex. S-26. Similarly, there was a $147,900 decrease in market value for investment money provided by Lucy Gray from trading between December 2012 to February and May 2013. Gov. Ex. S-29. None of these amount, totaling $246,300, should be counted in guideline loss.

### C. Loss Calculation

After subtracting out the $5,295,675 for the ROK shares and after crediting Baldwin for the amounts returned to the investors, the total loss figure is $4,250,825. After subtracting out the $246,300 attributable to decrease in market share, the total loss figure is $4,004,525, which results in an 18 point enhancement pursuant to U.S.S.G. §2B1.1(b)(1)(J) and not the 20-point

---

[6] One arrives at the $4,004.325 figure by starting with the $8,300,000 figure in the chart and subtracting out $5,295,675 for the value of the ROK shares and then $1,700,000 from the amounts that the government recognized were returned to Futura and Saudi Investments and then adding in the "approximately $1,000,000" in the chart attributed to loss to Saudi Investment.

enhancement argued for in the Government Version of the Offense and agreed to in the PIR. *See* PIR ¶ 32.

## II. The Factors Set Forth in 18 U.S.C § 3553(a) Justify A Below Guidelines Sentence.

Title 18 U.S.C. §3553(a) provides the framework for the imposition of federal sentences. *See Gall v. United States*, 552 U.S. 38 (2007); *United States v. Booker,* 543 U.S. 220 (2005). The statutory factors set forth in 18 U.S.C. § 3553(a) are intended to assist the Court in arriving at a just sentence, "sufficient but not greater than necessary" to achieve the purposes of sentencing.

The law that has developed since *Booker* makes clear that the Guidelines are only advisory and are not the only consideration at sentencing. *Gall*, 552 U.S. at 49. Rather, the Guidelines provide a starting point that Courts must consider. District Courts are not to presume that a within guidelines sentence is reasonable. *Nelson v. United States*, 555 U.S. 350, 351 (2009) (*per curiam*); *United States v. Panice*, 598 F.3d 426 (7th Cir. 2010).

In the place of a mechanical application of the guidelines, Courts are to conduct an individual assessment of each case based on the applicability of the factors set forth in § 3553(a), which correspond to the purposes of sentencing. In a statement on the topic of the proper consideration to be given to §3553(a) factors, the Supreme Court, in *Pepper v. United States*, reaffirmed the principle that the sentencing courts are to give due consideration to the individual being sentenced. 562 U.S. 476, 480 (2011) ("Highly relevant if not essential to the selection of an appropriate sentence is the possession of the fullest information possible concerning the defendant's life and characteristics.") (quoting *Williams v. New York*, 337 U.S. 241, 246-47 (1949); *see also United States v. Robertson*, 662 F.3d 871 (7th Cir. 2011).

In this case, a thorough consideration of § 3553(a) factors including the nature and circumstances of the offense and the history and characteristics of the defendant provides abundant support for a sentence significantly below the advisory guideline range.

a. **Nature and Circumstances of the Offense: 18 U.S.C. § 3553(a)(1)**

   i. **Baldwin Believed That His Business Would Be Successful and that He and His Investors Would Make Money.**

Although the government seeks to portray Baldwin as an inveterate fraudster intent on stealing investor money, the reality is far more complex. For many years, Baldwin was a successful financier and a respected member of the investment community. His company CMG Institutional Trading LLC was an underwriter in the September 14, 2005 Google Class A common stock offering alongside such prestigious organizations as Morgan Stanley, J.P. Morgan, Credit Suisse, UBS, and William Blair.



CMG Institutional Trading LLC was also an underwriter in the February 2006 Genworth Financial Class A common stock offering alongside entities such as Merrill Lynch, Citigroup, Goldman Sachs, J.P. Morgan, and Morgan Stanley.



CMG also participated in offerings from Build a Bear and TempurPedic. Baldwin's Piper Jaffrey Form 1099 showed gross proceeds less commissions of $852,430.29 based on his stock and bond trading.

Baldwin was a spokesman for Blackberry. He appeared regularly on CNN Live, CNBC Squawk on the Street, and CNBC Street Signs to speak about stocks prices, activity in the Mergers and Acquisitions Sector, and the infrastructure boom.







He was a 2016 Vanguard Award Honoree based on a determination from the State of Illinois

Office of the Comptroller that he was an "individual who…profoundly impacted African

18

American culture by demonstrating to others how to exceed in personal greatness while embracing excellence in their own lives."




Baldwin was saluted for his business contributions by Black Enterprise Magazine. He wrote articles that were published in *Forbes* and *Fast Company*. Through his company CMG, Baldwin hosted several economic conferences that were attended by Governor Bruce Rauner and President Barack Obama. He obtained a Postgraduate diploma from Oxford University in Financial Strategy. Baldwin received countless awards and was, by all accounts, a leader in the black community.

When Baldwin began accepting proceeds for loans and investments, he neither planned to fail nor believed that he would fail. His experience had been of personal and professional success

and wealth. He had every right to believe, and did in fact believe, that he would continue to enjoy financial success and prosperity and to bring the same to his investors. It was said best by the person who knows Baldwin the best–Phyllis Baldwin. Mrs. Baldwin wrote that Baldwin was a successful person since she met him when they were fourteen years old. Letter from Phyllis Baldwin (Jan. 25, 2020) ("Phyllis Letter") p. 2. He was voted most likely to succeed in high school, and, according to Phyllis, is a "natural optimist" who has enjoyed numerous professional successes including awards for being the top salesman at American Express, and who built his investment company CMG into a successful business. Mrs. Baldwin wrote:

> I firmly believe that Shawn thought that his businesses were going to take off and succeed. That was Shawn's every previous experience in life and there was no reason for him to doubt that he could repeat his successes. He did not simply use investor money to fund a lifestyle. He used it to fund a dram that involved office space and employees and investment ideas and conferences and speaking engagements and contacts. Maybe his dream was too big for the station he then occupied in life so it was doomed to failure. But Shawn did not believe that he was going to fail. He believed that he was going to build a successful company and make money for himself and his investors. He *believed* these things.

Phyllis Letter p. 3.

The evidence at trial was consistent with Mrs. Baldwin's analysis of Baldwin's actions. He procured office space in an impressive location, assembled the infrastructure of phone, internet and staff, worked from early in the morning until late in the evening, and was continually networking though conferences and meetings. Even the government expert Paniwozik had to acknowledge that the largest debit card expenditure for Baldwin was hotel, airfare, and train. Tr. 1273. Baldwin was working hard at building an investment business. And while it is true that the business did not succeed and a number of people lost money, that does not establish that Baldwin is a thief. If he were, he could have simply absconded with the investor funds to a tropical paradise rather than to have spent so much time and money on building his business.

20

While with 20/20 hindsight and appreciating, as one must, that Baldwin was attempting to achieve success in finance during the what was arguably the worst market decline in modern times, it could be argued that Baldwin should have gone about his business differently – traveling and networking less and working at his desk more. But even if this were accurate, it does not change the fact that Baldwin was attempting to build and believed that he was building a successful business that was going to deliver prosperity to him, to his family, and to his investors. Recognition of this fact is critical to arriving at a just and appropriate sentence in all of the circumstances of this case.

### ii. Trial Testimony Regarding Baldwin's Status in the Investment Community

Testimony from the government's own witnesses at trial establishes that Baldwin was a respected member of the investment community. Clark Delanois testified that he met Baldwin in 2002 as part of a marketing effort by his bank, Northern Trust, to attract affluent African Americans to Northern Trust for a business relationship. Tr. 256. After Delanois met Baldwin, they stayed in touch and discussed opportunities to network and to meet other affluent African Americans. Tr. 257. Baldwin invited Delanois to different events he was hosting with different institutional investors. Tr. 257 According to Delanois, Baldwin appeared to be financially successful and to know a lot about investing and the markets. Tr. 270. Baldwin talked about building his business and was well connected in investment circles. Tr. 271. Delanois testified that based on his observations of Baldwin over a 4-year time period, he believed that Baldwin's business had the potential for success. Tr. 274-75.

Paul Gompers, who was a Harvard Business School professor for 24 years, worked in finance and management and published extensively, met Baldwin in 2008 when Baldwin attended an executive education course at Harvard. Tr. 492. Baldwin asked Gompers to be an advisor to

CMG. Tr. 494. Gompers found Baldwin energetic and enthusiastic about the opportunity to be in the private equity business. Tr. 510.

Scott Brusso who was employed for nineteen years at the Chicago Mercantile Exchange as senior director of foreign exchange products met Baldwin and agreed to work with him and to serve as an advisor. Tr. 730-31, 736-45.

Jack Mosevich, a retired DePaul professor who had been the head of risk management at UBS, head of quantitative research at Harrid Investments, and who had run hedge funds, met Baldwin in 2003 on a panel at a conference on hedge funds. Tr. 1013-14. He met with Baldwin 8 to 10 times over the years and, on the basis of his experiences with Baldwin, agreed in 2007 to act at the chairman for a hedge fund conference in Doha Qatar. Tr. 1014-15. Baldwin reimbursed Mosevich for his airfare and paid him a $2,000 consulting fee for the conference. Tr. 1014-15. Later, Baldwin asked Mosevich to be on the advisory board for his company AIA and Mosevich agreed. Tr. 1016-17. Mosevich further agreed that Baldwin could list him on the AIA Group website. Tr. 1019.

Chris Geczy, an adjunct full professor at Wharton business school, met Baldwin at an executive director program and agreed o serve as an advisor to CMG. Tr. 1107. Geczy spoke at two conferences. Tr. 1111. He testified that he came to believe that Baldwin had significant knowledge of finance and investment and that this was one of the reasons he agreed to serve on the advisory board for Baldwin. Tr. 1120-21. Geczy testified that he went to the CMG offices and that Baldwin was proud of his offices and proud of his staff. Tr. 1121.

Luca Tenuta testified that he met Baldwin in London in 2013 at a meeting of people who were trying to put together Capcom, a telecom business. Tenuta Tr. 9, 179. Tenuta was aware that

Baldwin was interviewed on finance on CNBC and that he was knowledgeable about finance. Tenuta Tr. 183-86.

The government called witnesses who had held prominent positions in finance to make the point that Baldwin did not always follow through or that promotional materials overstated the involvement of these luminaries in the financial sector. Even if the government's viewpoint on that matter was correct, it does nothing to change the fact that Baldwin did meet these individuals, that he did impress them enough with his status and his knowledge of the finance sector to convince them to associate with Baldwin and his companies, and that he did do the work to attract talent to advance the prospects of his business.

### iii. Trial Testimony Regarding Baldwin's Efforts To Make His Business Successful

Testimony from government witnesses also established that Baldwin was running an actual business and not just pretending to do so. George Foster testified that he visited Baldwin's offices in the Spring of 2006 and that the offices were large with plaques on the wall including one that referred to Baldwin's company's role in the Google IPO. Tr. 283. Steven Gauthier who worked for Baldwin testified that between 2011 and 2014, Baldwin was building up CMG and Currency Clicks. Tr. 631. Gauthier testified that Baldwin maintained an office with computers, internet, staff, desks, and artwork. Tr. 631-32. Scott Brusso, senior director of foreign exchange products at the Chicago Mercantile Exchange, testified that he visited Baldwin's office which was "impressive." Tr. 734. Ethan Kniseley testified that he interned for Baldwin in July 2013 and did financial analyses for technology startup companies. Tr. 999. Kniseley testified that the offices were built out with computers, phone, internet, and televisions. Tr. 1010. Kniseley further testified that Baldwin was actively working at the offices, meeting people and staff, assigning research and attending industry conferences. Tr. 1011-12. Melissa Sheeley, who worked at Baldwin's offices

testified that Baldwin arrived at the offices early and left late, that he was in meetings, getting calls, and talking about various different topics. Tr. 1100. Sheeley confirmed that Baldwin frequently attended conferences. Tr. 1100.

### iv. Documentation of the Investments Disclosed Risks and/or Did Not Significantly Restrict Use of the Money.

The government's case focused heavily on having the various investors testify that they did not approve of the use of their money (in retrospect and after the investments failed and they lost money.) Accepting that the investors testified truthfully, it remains the case that the various agreements that they signed were inconsistent with their stated beliefs.

George Foster testified that he did not make a loan to Baldwin because he would never have loaned someone money. Tr. 291. Nevertheless, Foster signed a document entitled "Debentures" dated June 28, 2006 that was, in fact, a loan agreement and which did, in fact, state that the money could be used "for the lawful corporate purposes of the borrower." Tr. 370; Gov. Ex. 26. Gail Grabczynski likewise entered into a loan agreement with CMG which stated that her funds could be used "for the lawful corporate purposes of the borrower." Tr. 485-86; Gov. Ex. 36.

Twana Edwards also entered into a loan agreement although she testified that she did not consider the money she loaned CMG to be a loan, but rather an investment. Tr. 545-46. She acknowledged that the document she signed was a debenture agreement that allowed the funds to be used for the "lawful corporate purposes of the borrower." Tr. 530; Gov. Ex. 46. Sarah Sheehan loaned Baldwin money for operational purposes of the business. Tr. 1029-30. She also invested in Capcom, a telecommunications project in Nigeria and lost her investment when unrest in Nigeria derailed the project. Tr. 1046.

Individuals who invested in Currency Clicks did not even deal with Baldwin but with Alan Brown or Ralph Reme, signed subscription agreements that clearly set forth the risk of loss of the

investment, and stated that they understood the fact that Currency Clicks was in the very beginning stages of formation.

Michael Bell testified that he was brought the idea of an investment in Currency Clicks through a stock promoter called Ralph Reme.  Tr. 658.  When he spoke to Baldwin about the investment, Baldwin stated that it was a "new socially aware currency trading platform" that had a "great future."  Tr. 659.  Significantly, Baldwin informed Bell that "he couldn't make any promises but he thought that within a year he would be able to turn it over and sell it" and that worst case it would be 2-3 years.  Tr. 660.  Regarding his money, Bell stated that he thought that Baldwin would "use it wisely"  Tr. 660-61.  In terms of the use of funds, it bears remembering that one thing that Baldwin did with respect to Currency Clicks was to successfully hire Scott Brusso who worked for 19 years as the Senior Director of Foreign Exchange at the Chicago Mercantile Exchange to bring experienced people on board and to approach the CME to see if their education department would be willing to allow Currency Clicks to link to the CME site.  Tr. 753.  Bell also stated that Baldwin showed him the website for Currency Clicks and that it looked like a platform that could be functional and was close to ready.  Tr. 661.

The Currency Clicks subscription agreements  had the following disclosures:

SUBSCRIPTION AGREEMENT

OF

CURRENCY CLICKS

The undersigned hereby offers to invest in the Partnership ('the Partnership Interest" or "the Interest") of CURRENCY CLICKS (the "Company") as set forth in this Subscription Agreement.

By execution of this Subscription Agreement, the undersigned hereby acknowledges that the undersigned understands that the Company is relying upon the accuracy and completeness hereof in complying with its obligations under applicable federal and state securities laws.

The undersigned agrees and represents as follows:

1.  Representations, Warranties and Agreements.

The undersigned hereby represents and warrants to, and agrees with, the Company, as follows:

(a) That the undersigned is aware of the following:

(1) The Company shall be purchasing un-restricted shares of the company commonly known as "CURRENCY CLICKS" ("Currency Clicks") and the undersigned's investment in the Company is solely for shares of stock of Currency Clicks. The investment is speculative and involves a substantial degree of risk of loss by the undersigned of the undersigned's entire investment in the Company and that the undersigned understands and takes full cognizance of the risk factors related to the purchase of the Partnership interest.

(h) That the undersigned has been advised to consult with the undersigned's own attorney regarding legal matters concerning an investment in the Company and has done so to the extent the undersigned considered necessary;

(3) No federal or state agency has made any findings as to the fairness of the terms of the offering; and

(4) Any projections or predictions that may have been made available to investors are based on estimates, assumptions and forecasts which may prove to be incorrect; and no assurance is given that actual results will correspond with the results contemplated by the various projections;



GOVERNMENT
EXHIBIT

065

REPRT_005-000

26

(b) That at no time has it been explicitly or implicitly represented, guaranteed or warranted to the undersigned by the Company, the agents and employees of the Company, or any other person: (1) That a percentage of profit and/or amount or type of consideration will be realized as a result of this investment; (2) That any cash dividends from Company operations or otherwise will be made to the undersigned by any specific date or will be made at all; or (3) That any specific tax benefits will accrue as a result of and investment in the Company.

(c) That the undersigned is financially responsible, able to meet all obligations hereunder, and acknowledges that this investment will be long-term and is by nature speculative;

(d) That the undersigned is capable of bearing the high degree of economic risks and burdens of this venture including, but not limited to, the possibility of complete loss of investment and the lack of a public market which may make it impossible to readily liquidate the investment whenever desired;

Gov. Ex. 65.

Kelly Gray also invested in Currency Clicks and signed a subscription agreement. Tr. 442-44; Gov. Ex. 231. At the time she made the investment she knew that the company was being built and that she was getting in on the ground floor. Tr. 442. Russel Miller learned of Currency Clicks through Al Brown and signed a subscription agreement. Tr. 638-39; Gov. Ex. 198. Miller testified that he understood his investment in Currency Clicks was to "get it rolling." Tr. 646. Kent Van Horn learned of the Currency Clicks investment opportunity through Alan Brown and never even spoke to Baldwin before investing. Tr. 688, 690. He had known Brown for 6-7 years, believed Brown had a good grip on finance, and believed Brown had investigated Currency Clicks and its viability. Tr. 720. James Reigel invested in Currency Clicks through Alan Brown and signed a subscription agreement. Tr. 1167, 1169; Gov. Ex. 1-C. Harold Saul invested in Currency Clicks through Alan Brown and had never met Baldwin when he agreed to make the investment. Tr. 1189. Saul testified that no one made any guarantee regarding potential return on his investment. Tr. 1190.

With respect to Currency Clicks then, not only was it the case that many of the investors decided to invest based on conversations with Brown and not Baldwin, but the investment was fully disclosed to be a risky and speculative investment. Furthermore, testimony at trial established that Baldwin had made progress on the company including on the website and platform and in hiring talent from the CME to assist. While it is accurate that Currency Clicks did not ultimately succeed, the money that went into this investment is a far cry from a theft of funds by Baldwin.

### v. Luca Tenuta's Testimony Was So Filled With Inconsistencies and Absurdities and Loss to Tenuta and Futura Should Be Viewed Skeptically.

Luca Tenuto testified by video from London over the objection of the defense. He has lived in Monaco since 2012. Tenuta Tr. 6. He is no longer an investment banker, but now works in IT. Tenuta Tr. 7. By the time that the ROK shares were returned to Michael Winston Stevens, the investor who created Futura, Tenuta had no involvement in the process. Tenuta Tr. 145. A fair inference from Tenuta's testimony is that he had a professional disagreement with Stevens.

Tenuta admitted that he signed the Subscription Agreement introduced as Defense Ex. 2 and initialed every page. Tenuta Tr. 194. The Subscription Agreement is dated March 25, 2014. Def. Ex. 2. Under the Subscription Agreement, Futura agreed to make an equity investment in AIA Group LLC. *Id.* Luca Tenuta signed the Subscription Agreement as the "authorized signatory" of Futura. *Id.* There is another signature on behalf of Futura but it does not appear to be the signature of Michael Stevens. The Subscription Agreement discloses that the investment in AIA is speculative and carries a high degree of risk and provides that the investment is in accordance with the Confidential Private Offering Memorandum ("CPOM"). Tenuta Tr. 194, 196. Tenuta understood that under the Subscription Agreement, Futura was providing an equity investment in AIA. Tenuta Tr. 199. He acknowledged that the agreement provided that as the general partner of AIA, Baldwin had all management authority and full discretion over how the

assets were applied to AIA management. Tenuta Tr. 201. Futura agreed to be a limited partner of AIA. Tenuta Tr. 201.

Despite the clear import of these provisions, Tenuta testified that the Subscription Agreement never came into force and was superseded by the account brokerage execution account. Tenuta Tr. 231. Tenuta's attempted to support this rather bizarre position with Schedule A to the Subscription Agreement and its provision that "Individual shares will be held in the partnership name AIA Group LLC in the name of the Investor in book entry, a physical certificate will also be issued and sent to the investor." Def. Ex. 2. Tenuta took the position during his testimony that he didn't receive the physical shares of AIA and so the agreement never came into effect. Tenuta Tr. 231.

There are numerous problems with Tenuta's position. First, the provisions on Schedule A are not conditions precedent to the contract so that non-delivery of the shares would not invalidate the contract. This supposedly all-important delivery of shares is not even a representation or warranty of the Subscription Agreement.

Second, Schedule A contemplates the opening of a brokerage account—just on very different terms than the brokerage account opening document that Tenuta want to substitute the Subscription Agreement. Schedule A provides (1)(a) "After the transaction, the partnership will open a brokerage account to facilitate the sale of the shares or disseminate the shares to the investor's brokerage accounts." Def. Ex. 2.

Third, from Gov. Ex. 124, one can see that the Futura brokerage account that Tenuta testified superseded the Subscription Agreement was actually signed on the very same day as the Subscription Agreement—March 25, 2014. Gov. Ex. 124. In the email of this date Baldwin requested that Teuta "wire funds directly to the AIA Research Citibank account." Gov. Ex. 124.

29

Tenuta emailed Baldwin, also on March 25, 2014, suggesting changes to the email that Baldwin sent to him (so that he can presumably forward to others at Futura). One suggestion is to add "and insert in the reference Futura Partners account." *Id.* Another is to include "the bit we discussed about BNYM providing leverage $X$ ("Let's talk once you have spoken to them about the 2 stock positions I sent to you on Excel)." *Id.*

On the same day, March 25, 2014, Tenuta sent Stevens an email stating "Michael the account with AIA (Shawn) is now open. Will send another email where he explain how he leverage the stock separately Best Luca." Gov. Ex. 124. Interestingly, despite the fact that Tenuta signed the Subscription Agreement acknowledging that Futura was making an equity investment in AIA on the same day, there is no reference to this fact or this agreement in Tenuta's email to Stevens.

Fourth, curiously, on the same March 25, 2014 date that the Subscription Agreement was signed, Baldwin sent an email to Tenuta outlining his strategy for using existing shares with low volume i.e. the ROK shares. Significantly, Baldwin's March 25, 2014 proposal for "Set Up Procedures" states that Futura will "designate Shawn Baldwin to direct trades and IPO purchases." Gov. Ex. 189. The notion of Baldwin directing the trades is consistent with the Subscription Agreement and *inconsistent* with the arrangement of the "execution only" account that Tenuta claimed superseded all of the detailed arrangements that were made on March 25, 2014. *See* Tenuta Tr. 231.

Other information provided by Tenuta is odd, to say the least. Tenuta testified that he participated in preparing the AIA statements for Futura. Tenuta Tr. 93. He tried to explain that he did this because in London they were used to simple account statements. Tenuta Tr. 93. This is absurd. London is a major international financial center and it is ridiculous that Tenuta had to

prepare the AIA statements so that they were simple enough for London. The infirmity of Tenuta's position is underscored by his excuse that he drafted another AIA account statement of Futura because Baldwin was short of staff and Tenuta was trying to help. Tr. 164-65. Gov. Ex. 144. As with the comment about the need for simple statements for London, the testimony is not credible.

The import of the inconsistencies and difficulties with Tenuta's testimony is not entirely clear. Was Tenuta attempting to make agreements with Baldwin that he did not disclose to Stevens? Was Tenuta planning on misappropriating some of Stevens' funds? Was he merely assuming more investment risk in taking an equity position in AIA than he was willing to disclose to Stevens? It is impossible to know which of these possibilities or combination of possibilities is accurate. What is certain is that losses attributed to Futura and Saudi Investments account for $2,304,325 of the total loss attributed to Baldwin (after discounting for the $5,295,675 of supposed loss from the ROK shares that has not been established). What is practically certain is that Mr. Tenuta was not truthful in his testimony. Tenuta's position that Futura did not take an equity position in AIA is contradicted by the March 25, 2014 documents and emails, and flies in the face of common sense. When there is incomplete information as to what the actual arrangement was between Tenuta and Baldwin and what Tenuta's intentions were in dealing with Baldwin and AIA, it calls into question the reliability of the loss figure. These circumstances present powerful argument for a sentence significantly below the guideline range.

### vi. There Were Significant Omissions in the Testimony of Government Expert Paniwozik

The government introduced Paniwozik's testimony, in part, in support of its theory that Baldwin was simply a grifter who, but for his fraudulent scheme, lacked the means or ability to generate revenue or to provide for himself and his family. In support of this theory, Paniwozik testified on direct examination that he reviewed numerous trading, personal, and banking accounts

31

controlled directly or indirectly by Baldwin. Tr. 1251; *see* Gov. Ex. S-2.2 (listing accounts reviewed). Paniwozik repeatedly identified "beginning" account balances, listed various personal expenditures and expenses, and stated the ending balance, which was far lower and only a fraction of the initial sum. Tr. 1354; *see* Gov. Ex. 2. His review of Baldwin's accounts, however, was indisputably incomplete. *See, e.g.*, Tr. 1373.

Even more troubling was Paniwozik's failure to account for Baldwin's personal funds in his accounts, which further discredit the government's assertion that Baldwin paid for personal and professional expenses solely with client funds. For example, Paniwozik testified that Baldwin transferred $100,000 that received from George Foster to his Chase account, which ended in x9170, and used those funds to pay for rent, credit card purchases, and other miscellaneous expenses. Paniwozik ignored the other deposits into Baldwin's account that are reflected in the same account statement – none of which were alleged to have been investor funds including: (1) a $160,000 deposit in the same account on June 21, 2006; (2) a deposit into the same account of $47.508.15 on June 26, 2006; and (3) a deposit of $150,000 into the same account on July 3, 2006.

**JPMorgan**

June 21, 2006 through July 21, 2006
Account Number: **001110026039170**

## DEPOSITS AND ADDITIONS

| DATE | DESCRIPTION | | | AMOUNT |
|------|-------------|---|---|--------|
| 06/21 | Deposit | 68961034 | | $160,000.00 |
| 06/26 | Deposit | 69024587 | | 47,508.15 |
| 06/30 | Deposit | 69024601 | [Foster Investment] | 100,000.00 |
| 07/03 | Deposit | 25877635 | | 150,000.00 |
| **Total Deposits and Additions** | | | | $457,508.15 |

Ex. B (June 21-July 21, 2006 JPMorgan Chase Bank Account Statement).[7]

By "tracking" subsequent bank transfers and attributing payments and withdrawals to Foster's investment, as opposed to Baldwin's own funds, Paniwozik erroneously portrayed Baldwin's payments for rent, credit card purchases, and other expenses as an improper use of investor funds. *See id.*

Paniwozik's portrayal was not only inconsistent with Baldwin's history in the finance industry, as discussed above, it also was rebutted at trial with evidence of Baldwin's bank records and account statements. At trial. the defense introduced into evidence a Goldman Sachs account statement, which the government stipulated to as authentic. Tr. 2038; Def. Ex. 16. Baldwin's account reflected a balance in excess of seven million dollars and served as only one example of the materials Paniwozik did not review despite having testified that he reviewed every account. Tr. 2039-40. Similarly, Paniwozik further conceded on cross-examination that he had not reviewed Baldwin's account with Alpari, a Swiss bank. Tr. 1373. Other sources of income, such as a 295,000 loan, also were not factored into Paniwozik's analysis. *See* Gov. Ex. S-2.2. The Court found that evidence of other sources of funds to be relevant to the government's net worth analysis, regardless of whether accounts were related to investor funds. Tr. 1931. In short, these accounts and bank records directly undermine Paniwozik's analysis and the government's portrayal of Baldwin as merely a fraud, lending further support to the far more complex reality regarding his prior history as a financier, described in Section II(a)(ii), above.

---

[7] This document, apparently produced by Chase Bank, is bates stamped as CHASE_003-000705 to CHASE_003-000714.

### b. Baldwin's History and Characteristics: 18 U.S.C. § 3553(a)(1)

### i. Baldwin's Personal Background

Baldwin's mother and father were high school sweethearts and have been married for 56 years. PIR ¶ 57. His father is a retired supervisor for Ohio Bell who became to first black manager at Ohio Bell after serving in the Navy as a young man.Phyllis Letter p. 1. His mother is a retired General Motors factory worker PIR ¶ 57.. Baldwin is an only child. *Id.* When he was a child, Baldwin's parents worked opposite shifts so that one parent would be available to care for him. *Id.* ¶ 58. They resided in a lower socioeconomic area until they were able to relocate to a different neighborhood when Baldwin was in 6th grade. *Id.* Baldwin experienced racism in the neighborhood consisting of verbal and physical abuse. *Id.* He enjoyed a happy home life, however, and never felt poor. *Id.* Baldwin's parents valued education and supported Baldwin in enrolling in the Head Start program as well as in his studies. PIR ¶ 60. He played a variety of sports as a child. *Id.* ¶ 61. His father was a deacon in their Baptist church and Baldwin was involved in many church activities. *Id.*

Baldwin's father is now 78 years old and has suffered numerous strokes, high blood pressure, and is unable to walk or even get out of bed without assistance. *Id.* ¶ 75; Letter from Keisha Hill (Jan. 22, 2020) ("Hill Letter") p. 2. Baldwin has maintained a close relationship with his parents and is devastated not to be able to see them, as he recognizes that his father likely does not have long to live. His parents wrote to the court in a combined letter written by his mother, that Baldwin has been "a wonderful son, devoted father and husband. A man of faith." Letter from Carolyn Hill (Jan. 21, 2020) ("C.Baldwin Letter") p. 1. Cousin Keisha Hill wrote that when Baldwin speaks to his parents, he "reassures them he is alright so they will not worry" despite all of his own personal difficulties. Hill Letter p. 2.

34

Baldwin met his wife Phyllis Rodgers in high school at the age of 14 and they attended college together. PIR ¶¶ 63, 66. They became a couple when Baldwin was 17 years old, married in Dayton, Ohio in 1989, and moved to their own home when Baldwin was 23 years old. PIR ¶¶ 64, 66. Baldwin started off in the nightclub business, but became associated with various prominent individuals, was encouraged to explore politics, and landed in a successful career in finance. *Id.*

Baldwin and his wife had a daughter and then struggled for years to have a second child *.Id.* ¶ 67; Phyllis Letter p.1. They experienced many losses and an unsuccessful IVF trial. Phyllis Letter p. 1. They were thrilled when Phyllis finally became pregnant, but then tragedy struck when their son Adam was born 5 ½ months premature and dies just minutes after birth. *Id.* Phyllis wanted to give up on having more children, but Baldwin encouraged her to persevere and they ended up adopting a son from the Cradle in Evanston in 1998 which Phyllis describes as one of the best decisions they ever made as a couple. *Id.* Baldwin and Phyllis had two more daughters after adopting their son. *Id.*

Phyllis describes Shawn as "a devoted father for 30 years" who "always puts our 4 kids first." *Id.* Phyllis wrote of Baldwin:

> He was at every game, recital, play, concert, swim meet etc. He always encouraged the children to pursue their passions and to be the best person possible. Even now as he is suffering in jail he sends them words of encouragement and is still focused on staying connected and being a sounding board for their life pursuits.

*Id.* Baldwin's cousins, Sterling and Robin Titus echoed the same sentiment in their letter to the Court, explaining that Baldwin "successfully instilled [virtuous values] in his 4 children, to whom he has been an exceptional father and positive influence for all of their lives." Letter from Sterling and Robin Titus p. 1 (Jan. 24, 2020) ("Titus Letter"). Based on experience seeing Baldwin at numerous family gatherings, the Tituses observed that Baldwin was a good man, father, and son.

35

*Id.* They commented that Baldwin's "care and compassion for family has been a pinnacle and made him an example for many of the young men in our family to mirror. When you would see Shawn, you always saw him with his wife and family (children)." *Id.*

Baldwin's 15-year-old daughter wrote of her father that he was always by her side cheering her on in sports and helping her with her homework. Letter from Baldwin's Daughter p. 1 ("Daughter Letter"). In addition, she explained, her father would go out of his way to engage with other parents and coaches, would help her in the areas in which she needed work, always assured her that with hard work she could be a winner, and never allowed her to forget the importance of being charitable to those less fortunate and everyone around even if they were to wish her ill. *Id.* at 1-2. Baldwin's 29-year old daughter, Blair, wrote of her tremendous bond with her father forged by their shared internal drive to be the best they could be and the ambition to live a purposeful life. Letter from Blair Baldwin, p. 1 (Jan. 20, 2020) ("Blair Letter").

In terms of his professional life, Phyllis recalled that Baldwin worked long hours 7 days a week for years building up CMG as a business and networking. Phyllis Letter p. 2. To cover the cost of office space, Baldwin sublet to young entrepreneurs. *Id.* CMG participated in IPOs including those of Google, Build-a-Bear, Genworth, and Tempur Pedic, which helped to put CMG on the map in the financial industry. *Id.* Two of Baldwin's largest customers were Texas Teachers and the Illinois State Board of Investments. *Id.* After Baldwin's issues with FINRA, he set out to work as a consultant and to attend economic conferences and to support his family, and to try to rebuild his business. *Id.* at 3. He attempted to start another business and, based on his track record of success in business was confident that he would succeed. *Id.*

Phyllis described Baldwin as "kind, funny, strong, supportive and a leader." PIR ¶ 71. She went on to explain to the Probation Officer:

> [Shawn] has been very 'success driven' since his adolescence and he has been successful in all of his endeavors…[I]t is 'surreal' that he has been convicted of a crime, as he has reportedly 'never done anything illegal in his life.'

*Id.* Baldwin's personal and family background provide a strong indication of a loving and supportive base that will assist Baldwin in transitioning to a happy and productive life at the end of his prison term and underscore positive aspects of his character.

### ii. Family Members Attest To Baldwin's Kindness. Compassion and Good Character.

Numerous family members wrote to the Court on Baldwin's behalf to share their insights into the high quality of his character as displayed throughout his life. Close family friend Linda Hawkins wrote that Baldwin was one of the sweetest young men she had ever known and that his personality was "very calming, caring, always interested in the other person and what their needs are and how he can help them." Letter from Linda Hawkins, p. 1 ("Hawkins Letter"). Baldwin's uncle, Ronald Watson, wrote that Baldwin was a "caring responsible person throughout his life" and "good and principled person" who demonstrated "a helping spirit by being attentive to the needs of his grandparents and aunts and uncles." Letter from Ronald Watson, p. 1 ("R.Watson Letter"). Cousin Rhonda Watson wrote to the Court that Shawn has a benevolent nature and that "[o]ver the years I have observed him be helpful, patient and forgiving to others. His disposition is kind and optimistic." Letter from Rhonda Watson, p. 1 (Jan. 16, 2020) ("Rh.Watson"). Baldwin's aunt, Deborah Sherman, a 71-year-old government retiree wrote of Baldwin; "Raised in the church, Shawn was always an upstanding citizen, honest and trustworthy, ready to give back to the community." Mrs. Sherman recalled an occasion in which a group of her friends were interested in starting an investment club. Mrs. Sherman explained; "even with his busy schedule, Shawn agreed to come to Dayton, at his expense, to meet with the group of elderly ladies…." Letter from Deborah Sherman, pp. 1-2 (Jan. 22, 2020) ("Sherman Letter").

Cousin Shauntay Alexander wrote poignantly to the Court about her struggles growing up with low self-esteem and doubts about her self-worth. Letter from Shauntay Alexander, p. 1 (Jan. 24, 2020) ("Alexander Letter"). Ms. Alexander wrote that Shawn would constantly encourage her to believe in herself and to love herself. *Id.* When Ms. Alexander became pregnant at one 18, Baldwin made sure to contact her to administer wise and compassionate advice. He reminded her not to let her situation derail her ambitions and that even though she may have a harder path to reach her dreams, she would still be able to reach her dreams by different means. *Id.*

Shawn's close familial relationships throughout his life as well as the observations of his kind, gentle, charitable nature from those that know him the best present powerful argument for mitigation in this case.

### iii. Baldwin's Charitable Contributions to the Community

Longtime friend Marcus Ross, Assistant City Prosecutor for Columbus Ohio City Attorney's Office wrote of his observations of Shawn through their 15-year friendship. Ross stated; "Throughout our relationship I have come to know Shawn as a man of tremendous moral character, integrity and a person who has demonstrated commitment to his faith, family, and a firm belief in serving others through charitable and civic endeavors.

Baldwin's commitment to serving his community is evident through his actions. Linda Hawkins wrote about how one of Baldwin's uncles created a viable program to feed the hundreds of homeless people on limited resources and of the fact that Baldwin was involved in that project. Hawkins Letter p. 1. As was set forth in the letter of Phyllis Baldwin, he has always served as a mentor to others, whether by writing letters of recommendation for graduate school, looking over business plans, or sharing insights with new entrepreneurs to help them learn from his experiences. Phyllis Letter p. 2. One example of a person whose life Baldwin was able to change in a positive was Anne Sprecher, a single mom and dental hygenist who Baldwin trained and assisted in

obtaining 5 securities licenses. *Id.* Sprecher worked for Baldwin at CMG and is still working in the financial industry 15 years later. *Id.* at 2-3. Baldwin also acted as a mentor to trial witness Steven Gauthier who testified that Baldwin helped him to study for and pass his Series 3 and Series 30 exams. Tr. 629. Baldwin also assisted Ethan Knisley who interned with Baldwin and obtained his Series 3, 30 and 31 licenses while interning for Baldwin and using the study materials Baldwin supplied. Tr. 1007-08. Baldwin encouraged Melissa Sheeley, who he met while she was bartending, to come work for him and to study for her Series 3 license. Tr. 1094. Even after she tried and failed with the exam, Baldwin wanted her to succeed so he told her that her job duties were just to study. Tr. 1096.

Shauntay Alexander wrote about her discovery that Baldwin had been mentoring young men in the neighborhood but without ever disclosing their confidences. Ms. Alexander explained, "[m]aking a difference in the lives of others has always been important to Shawn. I remember learning of his mentorship of a few young men in the area while I was in high school. He knew they were acquaintances of mine yet he never disclosed the details of their discussions or how turbulent the lives in which they lived." Alexander Letter p. 1.

Loida Nicolas Lewis, the widow of Reginald Lewis and the Chairman of his charitable foundation wrote in support of Baldwin. Ms. Lewis met Baldwin at a fundraiser at her home and since that time was "the most helpful sponsor and Benefit Committee member" every time there was a fundraiser for the museum. Letter from Loida Nicolas Lewis p. 1 (Feb. 4, 2020) ("Lewis Letter"). Baldwin introduced her to prominent members of the financial community in Chicago and to African American individuals in money management, and real estate, many of whom became donors to the museum. *Id.* Ms. Lewis explained that she was very grateful to Baldwin "for his tremendous help in [the foundation's] fundraising project. *Id.* at 2.

John Carter, who worked for Baldwin between 2010 to 2014, wrote of Baldwin that he was an "unbelievable mentor" and truly provided Carter with an education in the financial sector. Letter from John Carter, p. 1 (Dec. 18, 2019) ("Carter Letter"). Carter wrote to the Court that he would forever treasure the training he received with Baldwin. *Id.* Carter observed that one of the reasons that Baldwin was so generous with his time and attention was that he was "passionate about giving back to other African Americans in the community. *Id.* at 1-2.

Phyllis Baldwin wrote of Baldwin's involvement as the first African American man to serve on the Board of the Chicago Abused Women Coalition, a position that he took on because of the impact of Phyllis' childhood experiences of domestic abuse. Phyllis Letter p. 3. Baldwin participated in the Houston Chavers Initiative and president of the NASP from 2001-2005. *Id.* "He has won the Whitney Young Award for the Boys Club, the Illinois State Comptroller Award and many more accolades for his work in the community and business community." *Id.* Even while awaiting sentencing, Baldwin has been teaching a bible class and sharing information on finance with other inmates. Sherman Letter p. 2.

As daughter Blair Baldwin explained, her father witnessed the rewards of hard work and wanted to share his experiences with others in small ways, such as constantly participating in career day in Blair's high school and in larger ways, "like providing real mentoring and internships for young black boys from underserved communities, all to ensure that they had the know how to succeed in the world." Blair Letter p. 1. Blair continued; "While [her father] has always been a busy man with a lot of his plate, the significance of his success and the positive impact that it could have within communities has never escaped him." *Id.*

Baldwin has unquestionably had a significant positive effect on his community, giving of his time, energy and experience and serving as an inspiration to young people who observed his hard work and success.

### iv. Avoidance of Unwarranted Sentencing Disparities for Similarly Situated Defendants

In this case, the government and the Probation Office both conclude that the low end of the Advisory Guideline range is 262 months. Baldwin disagrees because, as discussed in Section I(a). above, the government has not met its burden of establishing loss of $5,295,675 from the ROK shares. Under the proper calculation, the low end of the Advisory Guideline Range is 210 months. That figure, too, however, is significantly too high and is not a just or appropriate sentence under the facts of this case. The Probation Officer recognized as much in making a sentencing recommendation of 120 months. United States Probation Sentencing Recommendation, 17-CR-787-1, p. 5 (Nov. 19, 2019).

Pursuant to 18 U.S.C. § 3553(a)(6), one factor a Court should consider in arriving at a just and appropriate sentence and one not greater than is necessary is to avoid unwarranted sentencing disparities among similarly situated defendants. In *United States v. Parris*, the Court wrestled with the issue of a high advisory guideline sentence in a securities fraud case. 573 F.Supp 2d 744 (E.D.N.Y. 2008). Concluding that the concern over unwarranted disparities was a concern over achieving some sort of national uniformity in sentences, the Court asked for assistance from the government in assembling a table of sentences in security fraud cases across the country. The Court concluded that the sentences were affected by many variables including whether or not the cases were before of after the passage of the Sarbanes-Oxley Act and whether the defendants were cooperating. *Parris*, 573 F.Supp.2d at 753. Nevertheless, the Court concluded, that it was "perfectly clear there was a correlation between the losses in those cases and the periods of

incarceration.  Those who were not cooperating and were responsible for enormous losses were sentenced to double-digit terms of imprisonment (in years); those whose losses were less than $100 million were generally sentenced to single-digit terms." *Id.*

The chart below is reproduced from the *Parris* case and bears out the comments of the Court that loss figures of less than $100 million in securities cases generally yield a sentence of significantly less than a 10-year sentence.  In *Parris*, the Court sentenced defendants to 60 months after a jury verdict finding them guilty of conspiracy, securities fraud, and witness tampering. *Parris*, 573 F.Supp.2d at 756-62.  Loss was approximately $4.9 million and there were over 500 victims.  *Id.*  Given this sentence and the fact that, properly calculated, Baldwin's guideline loss is less than $5 million, his sentence is much more in line with a sentence of 42 months than 262 or 210 months.

| Name | Amount of Loss | Sentence |
|------|----------------|----------|
| Bennett | $ 100 million | 14 years |
| Ebbers | over $ 100 million | 25 years |
| Rigas (John) | over $ 200 million | 15 years |
| Rigas (Timothy) over | $ 200 million | 20 years |
| Skilling | over $ 1 billion | 24 years |
| Forbes | approx. $ 14 billion | 10 years |
| Kumar | $ 2.2 billion | 12 years |
| Ferrarini | $ 25 million | 145 months |
| Hotte | $ 67 million | 108 months |
| Formisano | $ 9.8 million | 78 months |
| Smirlock | $ 12.6 million | 48 months |
| Adelson | $ 50-$ 100 million | 42 months |
| Betts | $ 1.3 million | 366 days |
| Chavrat | $ 1.1 million | 6 months |
| Tursi | $ 1.1 million | 41 months |
| Scuteri | $ 2.5 million | 21 months |
| Kearney | $ 1.3 million | 51 months |
| Rutkoske | $ 12 million | 108 months |
| Cushing | $ 24 million | 97 months |

III.            **Supervised Release**

The defense has no objection to the term of supervised release or any of the mandatory or discretionary conditions of supervised release.  The defense objects to only one special condition of supervised release (3) at p. 29 of the PIR – "you shall if unemployed after the first 60 days of supervision, or if unemployed for 60 days after the termination or lay-off from employment, perform at least 20 hours of community service per week at the direction of the U.S. Probation Office until gainfully employed…."  The defense believes that it will take some time for Baldwin to secure a new profession after release from prison and would prefer that he have the time he needs to devote himself full time to the pursuit of these future endeavors so that he can return to supporting himself and his family as soon as possible. As this may also require additional education, adding a mandatory community service component would only serve to needlessly complicate the equation.

## CONCLUSION

To sentence Baldwin to anything close to the advisory guideline sentence in this case would be a serious injustice.  As set forth above, the nature and circumstances of the offense contain several mitigating factors such as proper documentation of the investments, Baldwin's intention that the investments succeed, and the unreliable nature of some of the testimony of Tenuta which calls Futura and Saudi Investment losses into question.  Furthermore, Baldwin's personal background, history of demonstrated charity toward his family and community, and his service for many years as a role model and mentor to young people in his community present powerful arguments for a sentence significantly below the advisory guidelines in this case.

Respectfully submitted,

By: _/s/ Carolyn Pelling Gurland_

CAROLYN PELLING GURLAND
THOMAS CULL
CHRIS JESKE
WHITE & CASE LLP
111 South Wacker Drive
Suite 5100
Chicago, IL 60606
(312) 881-5405

*Attorneys for Defendant Shawn Baldwin*

44

## <u>CERTIFICATE OF SERVICE</u>

I, Carolyn Pelling Gurland, attorney for Defendant, Shawn Baldwin, hereby certify that on this, the 5th day of March, 2020, I caused the above-described document to be filed on the CM/ECF system of the United States District Court for the Northern District of Illinois, which constitutes service of the same.

<u>/s/ Carolyn P. Gurland</u>

CAROLYN PELLING GURLAND
WHITE & CASE LLP
111 South Wacker Drive
Suite 5100
Chicago, IL 60606
(312) 420-9263
Carolyn.gurland@whitecase.com